Good afternoon, everyone. Please be seated. First case this afternoon is case number 411-0843, Kildeer v. Board of Trustees of the Teachers of Retirement System. For the appellate, Joseph Perkosky. For the appellee, Ralph Lowenstein. Mr. Perkosky, you can proceed. Good afternoon, Your Honors. May it please the Court. We are here today in large part due to the fact that the Kildeer School District decided to give a substitute teaching assignment to what is now a retired teacher, Ms. Barbara Emdy, back in 2008. This is the fall of 2008. What happens is, as a result of that sub-assignment to Ms. Emdy, TRS, Teachers Retirement System, assessed what amounts to a penalty against the Kildeer School District amounting to roughly $54,000, not counting the interest that is still accruing. The basis for TRS's application of this penalty against the Kildeer School District is an error. It's contrary to the statute. What TRS decided at that point in time is that the hiring of Ms. Emdy as a substitute teacher caused what was otherwise an exempt contract to become non-exempt. When I talk about exempt and non-exempt, I'm talking about relative to the Pension Reform Act of 2005. The Pension Reform Act of 2005 is pretty straightforward. It said that if you provide more than a 6% increase to a teacher in their final years of service, that the school district has to pay for the difference or the impact that that causes on the TRS retirement system. It was a shifting of the burden of compensating the pension retirement system for what amounted to a long, ongoing practice of providing teachers in their final years of service increases, which would help their annuity. So the statute, again past June 1, 2005, required school districts which gave more than a 6% increase to pay for that burden. However, the statute also provided an exemption clause, a grandfather clause. It rightly said that if you had a collective bargaining agreement that was entered into before June 1, 2005, it was exempt from this new rule. The earnings provided to a teacher under the exempt contract would not be counted with respect to determining whether the 6% cap had been violated or exceeded. Statutory language is pretty straightforward as far as what constitutes an exempt contract. If it was entered into before June 1, 2005, then it's exempt. There's no dispute over whether the contract was exempt. This one was. But the issue is, by her going back to teach, was she retired or not? And I noticed that she was paying contributions into the pension system. Would that have happened no matter which district she subbed in? Yes, that is correct. That would have happened regardless of what district she subbed in. That's actually one of our points, Your Honor, that had she gone down the road to, say, the Mundelein School District and subbed during that same time period, TRS has said in the record that there would not have been this penalty assessed against Kildare. But because she subbed in Kildare, that penalty is assessed. It makes no logical sense. What if she was already drawing her annuity and then went back and subbed? Do those substitutes pay into the pension system on the substitute wages? A different rule applies once you become retired. Once you start receiving an annuity under TRS, you're no longer paying a contribution as you were before. And you're limited as to how much service you can actually provide in that status as a retired or annuitant under TRS. So it was mandatory that she contribute since she wasn't drawing an annuity? Or could she have declined to contribute? She could not decline to contribute. And this is kind of the crux of the case. One of the issues that we have is Ms. Emdy retired under early retirement, an early retirement option. She ended her active service, her full-time service as a tenured teacher, on June 8, 2008. Under ERO, you can end that even if you're not yet 55. Remember under ERO, you have to be 55 in order to retire and get your full benefits. Now you can retire if you're only 54 at that point in time as long as you turn 55 within six months. And if you remember in the record, what it says is, or what it's clear, undisputed, is that Ms. Emdy turns 55 on December 6, 2008. So it's within that time period of six months. Now under the TRS rules, she starts drawing the annuity on December 5, 2008. So you kind of have this hiatus period between end of full-time active service as a tenured teacher, which again is June 8, 2008, and when she starts drawing on the annuity, which is not until December. So you kind of have this hiatus period, and that's when Ms. Emdy subbed in the Kildare District. And because she had not started drawing the annuity, again that didn't happen until December, she had to make contributions, and the school district had to make contributions on the substitute teaching assignment that she had received. There's no dispute as to any of that, and the district didn't pay that. We don't dispute having to have made those contributions on the sub teaching assignment. What we dispute is the fact that TRS counted all the earnings that Ms. Emdy accrued under the exempt contract and assessed the penalty. The penalty that was assessed was for her service as a full-time teacher in the final two years of her full-time teaching experience. And the reason why we think this is an error, violation of the statute, the statute doesn't say that you can't act as a substitute teacher during this hiatus period. All the statute says is that to maintain the exemption, you have to have entered into the contract before June 1, 2005, and according to TRS's own rules, as long as you don't amend that contract, it's still an exempt contract. Now what TRS is going to argue is that there was an amendment because of the sub assignment, but that doesn't make any sense and there's nothing in statute which provides for that. They're reading something that isn't there. If you look at the regulations, there's nothing in the regulations about losing the exempt status because of a subsequent sub assignment. There's nothing even in their own guidance, their publications, their employer publications, which are in the record, nothing in there which justifies TRS's decision here. Now what TRS is going to argue is that Ms. Emdy's continued service, quote-unquote continued service, the sub assignment constituted a change in her retirement date. That doesn't make any sense. Her retirement date never changed. She ended active service under ERO rules on June 8, 2008. She didn't begin drawing the annuity from TRS until December 5. That is exactly the notice that Ms. Emdy gave under the exempt contract back in 2006. That was never changed. She never changed her retirement date. They're saying that the amendment that occurs in this case is this substitute teaching assignment because it changes the retirement date, but it's nonsensical. Now they're relying in part upon an employer publication that they issued in 2009. Now this is after the fact. Remember Ms. Emdy retires in 2008. In 2009 there's an employer bulletin that's been issued that says that changing a retirement date could cause loss of the exempt status. Even if TRS has the authority to take that position, and I'm not disputing that, let's say that they do, that employer bulletin doesn't apply here because Ms. Emdy didn't change her retirement date. If you look at that employer bulletin, they give an example of what they mean by change of retirement date. In that example, and this is in the record, I'll refer to it quickly, it's in the record page 58-59 is the employer bulletin. If you read the example that's given, it talks about a teacher who changes her retirement date in order to qualify for ERO and in order to obtain the benefits under an exempt contract. That makes sense. If you change your retirement date in order to qualify for retirement, I can see their position that that is an amendment to an exempt contract and the status of exemption should be lost. But that's not what happened to Ms. Emdy. Ms. Emdy qualified for ERO, qualified for the benefits under the contract by June 8, 2008. She did not need the subassignment in order to qualify for ERO. She did not need the subassignment in order to receive the benefits under the contract. She had already achieved that. The district complied with the statute. The district complied with its labor relations obligations in that they had a negotiated contract which said that it will provide two years of incentives, retirement incentives, to Ms. Emdy. And they did that. And that was completed by June 8. Ms. Emdy did what she had to do. She ended full-time service as a tenured teacher. On June 8, 2008, under ERO. And she did it properly. She was eligible to go out under ERO at that point in time. June 8, 2008. It's the purpose of the supplementary report that she filed, where it shows her last day that she taught was 12-4-08. The 12-4-08 date was the end of the substitute teaching assignment. So what had happened at that point is TRS came in and said, well, the district needs to pay contributions on that substitute teaching assignment because Ms. Emdy had not yet begun drawing the annuity. Remember, she begins drawing the annuity on December 5. So from TRS's perspective, she doesn't begin drawing the annuity until December 5. The substitute teaching assignment that occurs in the fall that runs up until 12-4-2008, there has to be contributions paid on that. And that's the reason for that document. Did it change the amount of the annuity she was going to receive, having substitute taught those 52 days? It would go into the calculation of the annuity that she would receive. The substitute teaching assignment amounted to $7,700 roughly. And that is what she received for acting as a sub during the fall of 2008. Now, again, had she gone down the road and subbed in Mundelein and earned that same $7,000, TRS has said they would not have assessed the $54,000 penalty against Kildare. That makes no sense to me. I don't know how that makes logical sense relative to the statute. The statute is very clear. It says that TRS shall exclude earnings under an exempt contract. The shall is mandatory. Isn't there some provision that says for the same employer or something like that, with the same employer? Not relative. 16-158F I guess is what I'm looking at. 16-158F. I was talking about salary increases. I don't know. I just remembered when I was reading the briefs I saw that. What are they hanging their hat on? What is TRS hanging their hat on to make this distinction then? I think it's an error, but I think what they're saying is that because she acted as a substitute, that that was an amendment. In the same school district. That constituted an amendment or a change in her retirement date, which it's not logical. And even if, as you have pointed out, Your Honor, the $7,700 goes toward her annuity calculation, the statute doesn't say that that's wrong. The statute doesn't even address that. The statute simply says that TRS shall not consider earnings under the exempt contract. And TRS cannot prove, they have not proved, that this contract lost its exempt status. Simply by virtue of the fact that there was a substitute teaching assignment. Ms. Emdy qualified for ERO, qualified for the benefits under the contract by June 8, 2008. She did not need the sub-assignment to get those things. And again, if you look at what they're hanging their hat on, which is that employer bulletin that I mentioned issued in 2009. Again, at pages 58 and 59 of the record. I believe they're going to hang their hat on that bulletin because that's really the only, it's not in the regulations, it's not in the statute. It says if you change your retirement date, you lose your exemption. But the example they give is talking about a teacher who changes her retirement date in order to get the retirement incentive benefits, in order to qualify for ERO. That's not what Ms. Emdy did. How much did she increase her salary over the last two years? Under the collective bargaining agreement, she received 20% increases in the last two years of her service. Could she have received, or is there any question that she increased her salary because of the agreement, or that the salary increases were triggered by the agreement? The 20% increases were required by the collective bargaining agreement. Okay, so the agreement was, well, they were required if you announced an intention to retire. Which she did. I mean, she did what she had to do. It's a very straightforward contract, very common for that time period. 2002 is when it was entered into. I know that's a bad thing now. We're all saying it's a bad thing. But in 2002, very common to have 20% bump-ups in your final two years. The requirement was the teacher had to give a notice before the contract expired that they were going to go out at a specific time and service at a specific time. If they did that, they would get these 20% bump-ups. Now, the interest to the school was you would move along high-paid staff. So there was kind of an idea that you incent the higher-paid staff to maybe go out earlier than they might have otherwise. But to do that, you give them up to a 20% bump-up in their salary in those final two years. Again, I know it's a bad thing now politically, public policy-wise. But back in 2002, that's the way it was. And this is a collective bargaining agreement that went through 2006. And the district had no choice. Labor law says they have to comply with that contract. They had to give those bump-ups. Well, her annuity is not affected one way or the other by our ruling in this case. It's just whether the school district has to pay that money back to TRS. That is correct, Your Honor. The statute does not provide the board shall exclude salary increases paid to teachers under contracts where collective bargaining agreements entered into, amended, or renewed before June 1, 2005. So why are we talking about this other stuff? You've just indicated she got these salary increases per the bargaining agreement. It seems like it fits right into the statute. That's my point, Your Honor. Frankly, I don't know why we're here. I think it's as clear-cut as that. It's an exempt contract. They can't prove that it ever lost its exempt status. It has its exempt status. It had it then. It has it now. Ms. Emdy did nothing to change that. And you have to look at the collective bargaining agreement by that very language. You don't look at what the individual does when she retires, when she says she's going to retire. What you look at is the contract itself. That's all the statute says. It's very simple. Was it entered into before June 1, 2005? This clearly was. It was entered into in 2002. And it went through 2006. And that's the very type of contract that the exempt clause was meant to address. It's pretty straightforward. But, I mean, here we are. And I hate to be taking up your time with this. I don't think there should be an issue here. But the school district was assessed $54,000. With interest, it's probably above $60,000 at this point. And it's a very difficult pill for this district to swallow. It did everything it was supposed to do. It complied with its labor law obligations. It complied with its TRS obligations. It maintained the exempt status of that contract up through the point in time that Ms. Emdy ended full-time service. The other point I wanted to make quickly is that as a substitute teacher, she's not covered by any contract. Substitute teaching, as you might know, you're put into a pool. You're not guaranteed an assignment. You're not guaranteed continuing assignments. You're a temporary employee. You're not even a part-time employee. You're a temporary employee. And that's what Ms. Emdy was. And the interesting thing is that Kildare, as a matter of public policy from its perspective, likes to use its retired teachers to substitute teach because they know the district. They know the students. It's a good thing. But it's very strange that had Ms. Emdy not gone into the sub pool in Kildare but went down the road to Mundelein and went into their sub pool, that we wouldn't be here. That doesn't make any sense to me, that Kildare would not have been assessed that penalty. There's nothing in the statute, either Section F or G of 16-158, which says that you have to look at the same employer with respect to determining the exempt status of the contract. Well, I think that brings us back to where you started. Apparently the Board of Trustees of the Teachers Retirement System hinged their decision based upon a fact, as they found it to be a fact anyway, that she didn't retire. So my question to you, if that is a fact finding by them, what is our standard of review of that fact finding? Well, let me say this. I don't think it's a fact finding. I think it's a misapplication of the law, because there's no dispute as to Ms. Emdy acting as a substitute teacher in the fall, ending that service on 12-4-2008. There's no factual dispute on that. It is what you label that, and what you label that is application of the law. So I don't think that it's a fact finding issue. It's an application of the law, which under the standard of review, it's pretty clear with respect to application of the law. There's deference to the administrative agency, unless there's error. And there's clearly error here. Now, if it was a fact finding matter, it would be the clearly erroneous standard. But again, I don't think it's a fact issue. But even if it was, she's substitute taught. I mean, there's no dispute as to that. We say that. They say that. Interestingly, there really is little or no dispute over any facts. There are some things in the record where I think TRS talks about she gave a notice of a change in her retirement date. I don't think, though, that that's relevant. I don't think there's any facts to support that. So I don't think there's a factual dispute there. I think what they're really saying is by virtue of the fact that she accepted the substitute teaching assignment, she amended her retirement date, which, again, we don't see how that could be interpreted that way. Okay. You'll have rebuttal. Thank you, Your Honors. Mr. Lonesley. May it please the Court and Counsel. My name is Ralph Lowenstein, and I'm here on behalf of the Illinois Teachers Retirement System. The case before you involves a dispute between TRS and the Kildare School District on whether or not the district is liable for a contribution under 16-158F of the School of the Pension Code as a result of having increased the salary of one of its employees, in this case Barbara Emdy, by more than 6% over the prior school year. And as Justice Pope pointed out early on, she is correct, and the Court is correct, that the decision of the Court, regardless of which way it goes, will have no effect on Ms. Emdy's retirement annuity, nor is she a party to this particular dispute. Facts in this case are very simple and very straightforward. Kildare School District entered into a collective bargaining agreement with its exclusive bargaining representative, which covered the school years 2002 through 2006. One of the provisions was that during the last two years of employment, teachers could receive up to a 20% salary increase over the prior school year. In exchange for getting that retirement incentive, however, the employee had to provide the school district with an unqualified notice of intent to retire.  Barbara Emdy, who was the employee in this case, submitted her unqualified notice of intent to retire in April of 2006, stating in there that she intended to retire at the end of the 2007-2008 school year. And as a result of that, she then received salary increases of 20% in 2006-2007, 2007-2008. The problem here is that rather than retire or leave her employment with the Kildare School District at that time, neither she nor the school district complied with the provisions of the collective bargaining agreement. She instead continued to substitute teach at the Kildare School District for the first semester of the 2008-2009 school year. Is your client a party to the collective bargaining agreement? No. Well, how is it that your client then can take a position that those two parties didn't comply with their own agreement? Well, we're actually unfortunately required to do so because we have to interpret the grandfathering language which the legislature passed in subsection F and subsection G. So we're required then to go back and look and determine whether the payments were made pursuant to an exempt contract. It's not a task we relish, but it's a task that was really sort of imposed upon us by the legislature. Salary increase was not made pursuant to the collective bargaining agreement? No. We're not arguing that. Well, isn't that all the statute requires? No, I don't believe so. What's the specific language of the statute? Here's the problem. The regulation, which is 483, which interprets the original language in subsection F and the exemption language in G, provides that the payments have to be made under the terms of the exempt contract. And what happened here was that the payments were not made under the terms of the exempt contract because both the school district and Ms. Emdy disregarded the language in the collective bargaining agreement which provided that there has to be an unqualified notice of intent to retire. And she didn't do that. Oh, she did do that. Well, is it your position that because she went back as a sub the next fall, that negated all the paperwork she filed with the school district and TRS? Yes. But did she go back to work as a full-time employee? Are you suggesting she did not have a change in status? It doesn't matter, Justice Appleton. It doesn't matter whether it's a substitute teaching situation here or whether it's a consulting contract which an administrator might be given. The collective bargaining agreement, which was the exempt contract, provided that there had to be an unqualified notice of intent to retire, which was not honored by the Board of Education or by Ms. Emdy because she did this at a time when she was an active member of TRS, was making contributions toward her retirement annuity, and was receiving service credit. It was before she submitted her retirement papers to TRS. So she neither retired from the district nor did she retire from TRS. She continued to work for them. But I seem to take from your brief even, Mr. Weinstein, that you agree that if she had gone to teach as a sub in another district, this penalty would not have applied. And I know you claim that's irrelevant, but it seems to me to have some logical sense to it. It is, in my estimation, irrelevant because this Court traditionally doesn't give advisory opinions. But I want to answer your question because I think it's appropriate to do so because I've been told in some of your seminars that it's a good idea. The language in the statute which talks about receiving the payments from the same employer really answers that question. And that's why it may have been treated differently if, as opposing counsel says, she'd gone down the street and taught, substitute taught, at a different district. I don't think that you really need to reach that issue, but I did want to answer that. So the issue here is not that this wasn't an exempt contract. It was an exempt contract. The 2002-2006 contract was exempt. The problem here is not that the payments were made after the expiration of the exempt contract because our Regulation 483A allows that to happen. The problem here is that the district and Ms. Emdy did not honor the terms of that contract. They didn't comply with the terms of the contract. She wasn't paid under the terms of the exempt contract because of her continuance to be employed at a time when she continued to be an active member. They make several other arguments here throughout their briefs that I'll just touch upon. One of the arguments is that she ended her regular employment at the end of the 2007-2008 school year. But if you look back at the language of the statute, the language of the regulations, it doesn't talk about regular employment. And you look at the collective bargaining agreement, it doesn't talk about regular employment. It talks about retiring from your employment. And the second argument, which they- What if she had gone to work as a custodian in the grade school instead of a substitute teacher? She would have been out of TRS and that wouldn't have had any effect. Because she was employed as a teacher while she was an active member. If you're a retired teacher and let's say you've been on pension for three or four years and somebody in the district gets real sick or has a problem with pregnancy, whatever the cause is, and they're looking around saying, would you come back and do a couple of weeks for us to just cover the situation? It wouldn't have been a problem because she would no longer have been an active member of TRS. There are restrictions on how much- When do you become a non-active member of TRS? When you submit your retirement papers to TRS and say, I want to retire. And when did she do that? December of 2008. Initially, when did she do that? December 2008. What about the form she filed in, I thought it was in 06? No, that was the unqualified notice of intent to retire that she submitted as a condition for receiving the retirement incentives. She didn't retire from TRS until December of 2008, which was in large part the problem. She couldn't have retired in 2006 because she was still employed and she was still receiving her salary and her service credit, et cetera, plus she wasn't old enough to do so. Well, would that have been the case if she had left the Tildare District and gone to Mundelein to do the substitute teaching? She'd still be a member of TRS at that point, wouldn't she? She would still be an active member of TRS until she submitted her retirement papers to TRS, which happened in December 2008. If we want to address the hypothetical possibility of what would have happened if she'd gone to Mundelein, the answer to that is found in the statutory language where it talks about payments from the same employer. Now, we can, I suppose, argue about whether or not that is good policy, bad policy, makes sense, but TRS is required to comply with the statute as written, and the argument there, I think, really lies with the legislature. We're all burdened by having to comply with statutes. They don't always make sense. Well, it's created a job for me, so I'm grateful for that. So, the other argument that they've made has to do with, well, it's just a minimal payment. Once again, the language in the collective bargaining agreement doesn't talk about minimal payments. It doesn't make a distinction, wouldn't make a distinction, if this had been an administrator who'd got a consulting contract after they also submitted their unqualified notice of intent to retire, or whether it's substitute teaching, as in this case. So, while on the surface, these things may be of interest or appealing or whatever, from a legal standpoint, I really don't think that they carry any weight here. So, there's nothing, I want to be sure I understand, there's nothing really in the statute, by looking at the statute, that would tell us she didn't comply and the school district didn't comply. What you're saying is, if you look at the collective bargaining agreement, she didn't comply with that, and therefore... Well, yes and no. The language in G talks about exempt contracts, which means to me that you actually have to comply with the terms of the exempt contract. We were really required under F, subsection F, to flush this out with our rules and regulations, which of course under the Administrative Procedures Act, we also have the right to do. We did that with 483A, which I think, once again, makes clear that you have to receive the benefits under the terms of the exempt contract. I thought the contract was exempt simply because of the time frame that the contract existed. The contract was exempt, but they didn't comply with the terms of the contract. And I say that we were required to pass regulations by the statute. We did pass regulations, both by the Administrative Procedures Act and by our requirement under the statute, that makes clear that the payment has to be made under the terms of an exempt contract. And I think it clearly follows from G, which talks about the exempt contract. So I don't think we made any illogical jumps. I don't think we went beyond what we were allowed to do. I don't even think the Kildare School District says that the regulations are not binding. They disagree with how they're to be applied. Okay. Thank you very much. All right. Thank you very much. Appreciate it. We'll have rebuttal now. Thank you, Your Honors. First of all, I would like to say that it sounds like at this point that TRS's position is that we lost the exemption on this contract because we did not comply with the terms of the contract. I hear them say that, but I don't see how they're pointing that out. The terms of the contract are pretty straightforward. They're in the record on page 98, and it talks about what the employee has to do and it talks about what the employer has to do relative to receiving these 20% bump-ups in the final two years of service. They don't dispute that Ms. Emby gave a proper notice. They don't dispute that the district paid out the 20% bumps. So I'm not sure what they mean when they say that we did not comply with the terms of our own contract. And trust me, had we not complied with the terms of our contract, we would have had a grievance. The union would have filed a grievance against us. The union has no dispute with us. We complied with the contract. Ms. Emby received the benefits that she was supposed to receive. The district did what it was supposed to do. So I don't know what they're saying. As far as I can tell, what they're saying is that it's this substitute teaching that establishes that they didn't comply with the contract. But the contract doesn't say anything about an inability to substitute. As I understand what Mr. Lowenstein said, if she had done her retirement to get her 20% bumps and still had to wait six months to actually begin receiving benefits and had then gone back to substitute teaching, no problem. But because she went back before she was entitled to actually receive benefits, it wasn't really a retirement. Yes. Is that how you understood his answer to me? I believe that is what he's saying. But the problem with that argument is the statute doesn't prohibit that. The statute doesn't say that Ms. Emby was unable to teach during that period of time. Do the regulations prohibit it? The regulations don't say that either. The regulations don't say it and their own publications don't say that. In fact, they permit teachers to substitute teach during that time period. The other thing that's important to remember here, it's somewhat disingenuous to talk about retirements and use of that term as a term of art. TRS has its definition. In this case, it's December 5th. We don't dispute their definition of it. But the ERO provisions, which are just as clear as these provisions, the early retirement option for a teacher under TRS guidance is that you can end full-time service at the end of, in this case, the 07-08 school year, which was June 8, 2008, and still retire in December because you were within six months of age 55. And that's the position Ms. Emby was in. And they never changed that. Right. But did they say that you can go back and sub during that period? Did they, being the school district? No, the regulations. Regulations do not address that. They never say that you cannot sub. I challenge them to show me something in the statute, the administrative code, in their own publications, which they have free reign over, to issue and interpret. I challenge them to show me where it says that you cannot substitute teach during that period, or even if you do, that that somehow causes an exempt contract to lose its exempt status. It's nowhere. It doesn't exist. Frankly, I think they made a mistake here. They made a mistake in applying the guidance that they issued in 2009, thinking that this was the type of situation that the retirement date was changed in order to allow a person to become qualified for those benefits that Ms. Emby was already qualified for. Again, I ask that you look at that employer bulletin, which is in the record at pages 58 and 59. It's the 2009 guidance. It gives an example of what they mean. And it talks about a teacher who needs to work ten more days into the next school year in order to become ERO qualified. That's the example. That's what that whole publication is about. That doesn't apply here. Ms. Emby had already achieved everything she needed to achieve by the time she ended service with the district, full-time service on June 8th. Except her birthday. Except her birthday. She had to wait. But that's consistent with the statute, that she's allowed to do that. She is allowed to end full-time service in June 8th, 2008, because she had enough years. The only issue was she wasn't quite yet 55. But the statute says you can still retire as long as you're going to turn 55 within six months, which she did. But under TRS rules, they don't start paying that annuity until she turns 55. So that's why the substitute teaching assignment that occurs during what I again call this hiatus period between end of active service as a full-time teacher and annuity beginning, that's why that money, the earnings she receives there, does go to her annuity. Because she's still not an annuitant. Okay, counsel. You're out of time. Thanks to both of you. The case is submitted and the court stands in recess.